[No. 9037.  Department Two.  December 7, 1910.]

C. R. JONES, *by his Guardian Ad Litem John Jones,
Appellant,* v. JOHN C. LESLIE *et al., Respondents.*[1]

PROPERTY—SUBJECTS OF—LABOR.  The right of employment in a laboring man is property.

MASTER AND SERVANT—BLACKLISTING—DAMAGES.  Damages are recoverable by a servant, where on giving notice to his employer that he was quitting to take a better job, the employer objected, and prevented the servant from securing the other job by notifying the prospective employer not to employ the plaintiff and that if he did so defendant would withdraw his custom and discontinue business relations existing between them.

Appeal from a judgment of the superior court for King county, Gay, J., entered May 31, 1910, dismissing an action for damages for blacklisting, upon withdrawing the case from the consideration of the jury.  Reversed.

*John E. Humphries* and *George B. Cole,* for appellant.

*Farrell, Kane & Stratton,* for respondents.

DUNBAR, C. J.—C. R. Jones, by his guardian *ad litem* John Jones, complains of the defendants John C. Leslie, Leslie Power Company, Inc., L. S. Winans, and Seattle Cracker & Candy Company, a corporation, and alleges, in substance, that on or about the 12th day of August, 1909, and long before said time, the plaintiff, C. H. Jones, was employed by the defendant Leslie Power Company as a teamster, and was driving a wagon and team for said defendant; that some time prior to the 12th day of August, plaintiff made an oral contract and agreement with Steeves Brothers, who were then in the teaming business in Seattle and who were employed as teamsters by the defendant Cracker Company, to work as a teamster for Steeves Brothers for a stipulated price, for an indefinite period; that on or about the 12th day of August,

[1]Reported in 112 Pac. 81.

1909, the defendants J. C. Leslie and Leslie Power Company, Inc., notified the Cracker Company that, if the Cracker Company permitted Steeves Brothers to employ Jones, the Leslie Power Company would withdraw all its patronage from the Cracker Company and refuse to trade with it further; that the Cracker Company, for the purpose of keeping the plaintiff from being employed by Steeves Brothers, connived, confederated, and conspired together and notified Steeves Brothers that they must not employ this plaintiff as a teamster at all, and caused Steeves Brothers to refuse to employ the plaintiff as a teamster; that the said defendants then and there, wrongfully and unlawfully, and against the rights of plaintiff, blacklisted the plaintiff with Steeves Brothers; that by reason of the things aforesaid, the plaintiff was thrown out of employment, and remained idle from the 12th day of August, 1909, until the 27th day of September, 1909; alleged specific damages.

The answer of all the defendants was practically a denial. On motion, a nonsuit was granted in favor of defendants, L. S. Winans and the Seattle Cracker & Candy Company, and at the close of all the testimony, the court sustained a motion of the defendants J. C. Leslie and the Leslie Power Company for judgment in their favor, and dismissed the case as to all the defendants, entering judgment in their favor and against the plaintiff. From this judgment, this appeal is taken.

The testimony in this case is somewhat conflicting. It will be necessary, therefore, to examine only the testimony of the appellant, plaintiff below, to determine whether or not the court erred in granting the motion of nonsuit. We may state here that we think there was no error of the court in granting the motion in favor of Winans and the Seattle Cracker & Candy Company, as there is no indication of any conspiracy in the case. It seems that the appellant, young Jones, was working for the Seattle Cracker Company and Steeves Brothers; that during the summer vacation he was laid off,

so that some relative who was at home during the vacation could take the job, with the understanding that the appellant should have the advantage of the first opening. He then went to work for the respondent Leslie Power Company, and in time he was notified that he could have work again with Steeves Brothers or the Cracker Company. One of the employees of the respondent Leslie Power Company informed Mr. Leslie, the president and manager of that company, that Jones was going to quit. Mr. Leslie called him in and asked him about it, and he told him that he was going to quit as he had a better job at more wages. Leslie wanted to know of him if he was going to leave him in the lurch, and the appellant told him that he could not give him any more time, that he would commence working for his new employer on Monday the 15th; whereupon Leslie told appellant that, if he left him in the lurch, he would see that he never got the job with the Cracker Company; and he immediately repaired to the telephone and sent the following message to the Cracker Company:

"Question: State what he said over the telephone. Answer: He told him that he thought I didn't do him right. He said that he was a good customer there, and he said 'You know it.' He said, 'If you hire him I will certainly not buy any more crackers from you.'"

Another witness testified to hearing substantially the same message, and there is some evidence from the guardian Jones and a man who was with him that Leslie admitted having tried to injure the appellant for the reason that he had tried to injure him, or as he expressed it, "had done him dirt." The message which Leslie testifies to sending was of a different character, and would probably not be actionable. But the determination of the credibility of the witnesses was a matter resting entirely with the jury. It also appears from the testimony, that the appellant was discharged by Steeves Brothers through the interposition of the Cracker Company, for the reason that they did not want to lose a good customer.

This presents a case here which is purely a question of law. It would be well to remember, in the beginning, that it is fundamental that a man has a right to be protected in his property. This was the doctrine of the common law; is, and always has been, the law in every civilized nation. It is, of necessity, one of the fundamental principles of government, the protection of property being largely one of the objects of government. For the protection of life, liberty, and property, men have yielded up their natural rights and established governments. Is, then, the right of employment· in a laboring man property? That it is, we think cannot be questioned. The property of the capitalist is his gold and silver, his bonds, credit, etc., for in these he deals and makes his living. For the same reason, the property of the merchant is his goods. And every man's trade or profession is his property, because it is his means of livelihood; because, through its agency, he maintains himself and family, and is enabled to add his share towards the expenses of maintaining the government. Can it be said, with any degree of sense or justice, that the property which a man has in his labor, which is the foundation of all property and which is the only capital of so large a majority of the citizens of our country, is not property; or, at least, not that character of property which can demand the boon of protection from the government? We think not. To destroy this property, or to prevent one from contracting it or exchanging it for the necessities of life, is not only an invasion of a private right, but is an injury to the public, for it tends to produce pauperism and crime. This relief has been granted to employers in many forms. Workmen have been enjoined from collecting about the employer's place of business for the purpose of ridiculing his employees with a view of causing them to stop work; and many other demonstrations of the same character and purpose have been enjoined, of course, on the theory that it was an unlawful act. To deny the same relief to the employee under similar circumstances would be a reproach to the law. It is true that in many cases the

element of conspiracy existed, but the principle is the same. Nor have the courts refused this protection to employees, but in a vast majority of cases of the kind it has been held that a legal right had been invaded, and the law imposed a liability.

There are few cases that might possibly sustain the respondent's contention. Those which they have cited, however, we think are clearly not in point, or are easily distinguished from the case at bar. *Benjamin v. Wheeler*, 8 Gray 409, and *Randall v. Hazleton*, 12 Allen 412, do not deal in any way with the principle under discussion here. In *Heywood v. Tillson*, 75 Me. 225, 46 Am. Rep. 373, it was held that an employer had a right to refuse to employ, or to retain in his service, any person renting certain specified premises; and the owner of such premises had no cause of action against him for the exercise of such right, though such refusal was through malice or ill-will to the owner. An examination of that case shows that there were conditions which the defendant had a right to take into consideration in employing men, and which no one else had a right to question; that if his employees remained in the house the rent of which was the subject of controversy, the renting of the house being the business of an enemy of the employer, it was liable to affect the character of the workmen and their attitude towards their employer. So many other questions entered into the consideration of that case that it seems to us it has no bearing on the case at bar.

*Raycroft v. Tayntor*, 68 Vt. 219, 35 Atl. 53, 54 Am. St. 882, 33 L. R. A. 225, was another case of somewhat the same character. There a superintendent of a quarry refused to permit another to take stone therefrom unless the latter discharged a certain employee, and it was held that he was not liable for causing such discharge. But whether the court wisely decided this case on the circumstances controlling it, it was evident that the court proceeded upon the theory that there was no lawful right invaded in that particular

case, and that where the lawful right was invaded, an action would lie, for in discussing the case, it said:

"The authorities cited for the plaintiff clearly establish that if the defendant without having any lawful right, or by an act, or threat, *aliunde* the exercise of a lawful right, had broken up the contract relation existing between the plaintiff and Libersont, maliciously or unlawfully, although such relation could be terminated at the pleasure of either, and damage had thereby been occasioned, the party damaged could have maintained an action against the defendant therefor."

The English case upon which this doctrine of nonliability rests—and we have gone outside of the cases cited by the briefs for the purpose of determining this case, as the principle involved seems to us to be of some importance—is *Allen v. Flood*, 67 L. J. Q. B. 119. This is the celebrated Boilermakers case, where the boilermakers in common employment with the respondents, who were shipwrights working on wood, objected to work with the latter on the ground that in a previous employment they had been engaged on iron work. The appellant, an official of the Boilermakers' Union, in response to a telegram from one of the boilermakers, came to the yard and dissuaded the men from immediately leaving their work, as they threatened to do, intimating that if they did so he would do his best to have them deprived of the benefits of the union, and also fined. The appellant then saw the managing director, to whom he said that if the respondents, who were engaged from day to day, were not dismissed, the boilermakers would leave their work or be called out. The respondents were thereupon dismissed, and it was held by a majority of the judges in the House of Lords that no action would lie. This opinion by the different Lords is entirely too long to review or to make any attempt to review. But whatever may be said of it, it is tinged with the idea which prevails in many of the decisions that, where competition is the stimulating motive in interfering with employment, such competition is a justification for the act. But even outside of that question,

the opinions of the majority of the Lords in this case show that they are not in harmony with the rule that had theretofore been established in the English courts, and that has since been almost universally followed in both England and America. The Lords themselves were informed of this by the very able dissenting opinion of the Lord Chancellor who, after reviewing the cases and the case under consideration, concluded as follows:

"I regret that I am compelled to differ so widely with some of your Lordships, but my difference is founded on the belief that in denying these plaintiffs a remedy we are departing from the principles which have hitherto guided our courts in the preservation of individual liberty to all. I am encouraged, however, by the consideration that the adverse views appear to me to overrule the views of most distinguished judges, going back now for certainly two hundred years, and that up to the period when this case reached your Lordship's House there was an unanimous concensus of opinion; and that of eight judges who have given us the benefit of their opinions, six have concurred in the judgments which your Lordships are now asked to overrule."

One of the oldest cases on this subject is that of *Keeble v. Hickeringill*, 11 East 574. This was an action for interfering with a certain right of hunting by the plaintiff, and of a right to the use of a certain pond or grounds. The discussion of the case took a wide scope. The opinion was rendered by Chief Justice Holt, and in the course of the discussion by the eminent judge, he divided these different classes of actions as follows:

"Now there are two sorts of acts for doing damage to a man's employment, for which an action lies; the one is in respect of the man's privilege; the other is in respect of his property. In that of a man's franchise or privilege whereby he hath a fair market, or ferry, if another shall use the like liberty, though out of his limits, he shall be liable to an action; though by grant from the King. But therein is the difference to be taken between a liberty in which the public hath a benefit, and that wherein the public is not concerned. . . . The

other is where a violent or malicious act is done to a man's occupation, profession, or way of getting a livelihood; there an action lies in all cases."

In *Bowen v. Hall*, 50 L. J. Q. B. 305, on appeal from the judgment of Queen's Bench, it was held that, where one had a contract for exclusive personal service, the plaintiff could maintain an action against the defendant for maliciously procuring the other party to the contract to break it, notwithstanding that the strict relation of master and servant did not exist between them.    There it was said:

"Merely to persuade a person to break his contract may not be wrongful in law or fact,  .  .  .   but if the persuasion be used for the indirect purpose of injuring the plaintiff, or of benefiting the defendant at the expense of the plaintiff, it is a malicious act, which is in law and in fact a wrong one, and therefore a wrongful act, and therefore an actionable act if injury ensue from it;"

citing *Lumley v. Gye*, 22 L. J. Q. B. 463.

In an article in 54 Central Law Journal, commencing at page 425, an extended review is made of this subject, and the authorities cited.    There a quotation is made from the case of *Doremus v. Hennessy*, 176 Ill. 608, 52 N. E. 924, 54 N. E. 524, 68 Am. St. 203, 43 L. R. A. 797, where the court said:

"The common law seeks to protect every person against the wrongful acts of others, whether committed alone or by combination, and an action may be had for injuries done which cause another loss in the enjoyment of any right or privilege or property.    No persons, individually or by combination, have the right to directly or indirectly interfere or disturb another in his lawful business or occupation or to threaten to do so for the sake of compelling him to do some act, which in his judgment, his interest does not require.    Losses willfully caused by another from motives of malice to one who seeks to exercise and enjoy the fruits and advantages of his own experience, industry, skill and credit, will sustain an action."

In that case the action was for the interference with an employment.    It was further said:

"Appellee's counsel concede, and we think it is the law, that where one maliciously brings about the discharge of an employee, where the contract between the latter and his employer is terminable at will, the injured employee is entitled to recover."

The same author, in discussing the natural consequence of competition between laborers, where it is conceded that the man who underbids his rival may retain the latter's situation with impunity, says:

"But if an interloper seeks, not employment for himself or for one in whom he is directly interested, but the mere discharge of another, such conduct is wanton, unjustifiable in law, and actionable if damage result."

And the article concludes as follows:

"From the foregoing discussion the rule of law may be deduced, that every one has a natural right to conduct his trade, business, profession, or legal relationship arising out of contract free from all intentional and wanton interference on the part of those whose sole object is to damage him by refusing his patronage, withdrawing his employees, or interrupting the valuable relation into which he, by contract, has entered."

In *Purington v. Hinchliff*, 219 Ill. 159, 76 N. E. 47, 109 Am. St. 322, 2 L. R. A. (N. S.) 824, it was held that any person or combination of persons who unlawfully, by direct or indirect means, obstruct or interfere with another in the conduct of his lawful business, are liable in damages for loss wilfully caused by such action. In the case of *London Guarantee & Accident Co. v. Horn*, 206 Ill. 493, 69 N. E. 526, 99 Am. St. 185, appellee was in the employ of Arnold, Schwinn & Co. of Chicago, as foreman of the frame department of its bicycle factory, and on that day, while engaged in his work, was injured while attempting to operate a milling machine, from which he suffered the loss of two fingers on his right hand. At the time of this injury, Arnold, Schwinn & Co. carried an indemnity policy in the London Guarantee & Accident Company, indemnifying the firm from injuries to its

employees, to the extent of $5,000. The policy provided that, if any suit should be brought against the assured to enforce a claim for damages on account of an accident covered by the policy, immediate notice thereof should be given to the company, and the company would defend, etc., the ordinary provisions in an indemnity policy. The company offered the appellee a certain amount of money in settlement of his claim, and informed him that, unless he accepted that amount they would see to it that he was not re-employed by Arnold, Schwinn & Co. The offer was refused, and suit was brought against Arnold, Schwinn & Co., in which a verdict was subsequently rendered for $3,500. The statement is long, but the essence of it is that the insurance company prevailed upon the employer to discharge the plaintiff by threatening to cancel the policy which the manufacturing company had in its company, and the suit was brought against the London Guarantee Company by Horn for damages for loss of employment, and the court held that he could recover, holding that one whose discharge from employment was procured by a third party had a right of action against such party. In this case the authorities are reviewed at great length, and the general doctrine announced as we have indicated.

In *Chipley v. Atkinson*, 23 Fla. 206, 1 South. 934, 11 Am. St. 367, it was held, that an action lies in behalf of an employee against a person who has maliciously procured the employer to discharge such employee from employment in which he is engaged under a legal contract; and that an action will lie where the period for which the employment is to continue is not certain, if damage result from the discharge; that the fact that no contract or legal right of the employee as against the employer is violated by the employer, or that no action can be maintained by the employee against the employer for such discharge cannot prevent a recovery against the third person who has maliciously procured the discharge, and which discharge would not have occurred but for such procurement. In *Thacker Coal etc. Co. v. Burke*, 59 W. Va.

253, 53 S. E. 161, 5 L. R. A. (N. S.) 1091, it was decided that one who maliciously entices a servant in actual service of a master to quit his service is liable to action therefor, and that if one wantonly and maliciously, whether for his own benefit or not, induces a person to violate his contract with a third person to the injury of that third person it is actionable. In *Moran v. Dunphy,* 177 Mass. 485, 59 N. E. 125, 83 Am. St. 289, 52 L. R. A. 115, which was an action for maliciously by means of slanderous charges inducing a third person to discharge the plaintiff from his employ, the action was sustained, the court saying:

"Finally, we see no sound distinction between persuading by malevolent advice and accomplishing the same result by falsehood or putting in fear. In all these cases the employer is controlled through motives created by the defendant for the unprivileged purpose. It appears to us not to matter which motive is relied upon. If accomplishing the end by one of them is a wrong to the plaintiff, accomplishing it by either of the others must be equally a wrong."

See, also, *Employing Printers' Club v. Doctor Blosser Co.,* 122 Ga. 509, 50 S. E. 353, 106 Am. St. 137, 69 L. R. A. 90; *Perkins v. Pendleton,* 90 Me. 166, 38 Atl. 96, 60 Am. St. 252; Addison, Torts (8th ed.), p. 7.

There are hundreds of these cases cited in the cases which we have quoted from which sustain the doctrine that the person causing the loss of employment under such circumstances as were the cause of the loss in this case are liable if damages ensue. It seems to be almost the universal doctrine of the courts of the country. Nor are we able to find any just criticism for such a rule. It is an excellent rule of action to refrain from interference with the affairs of others, and especially if the motive actuating such interference is to work injury to others.

The judgment will be reversed, and the cause remanded with instructions to proceed with the trial of the case.

RUDKIN, C. J., CROW, CHADWICK, and MORRIS, JJ., concur.