[No. 854–42442–3. Division Three. May 9, 1974.]

FRANCIS E. HOLMAN *et al., Appellants,* v. J. PAUL COIE *et al., Respondents.*

*Stuart G. Oles* and *David C. Stewart* (of *DeGarmo, Leedy, Oles & Morrison*), for appellants.

*William L. Dwyer* (of *Culp, Dwyer, Guterson & Grader*), *William A. Helsell* (of *Helsell, Paul, Fetterman, Todd & Hokanson*, and *Jack P. Scholfield* (of *Guttormsen, Scholfield & Stafford*), for respondents.

MUNSON, J.—Plaintiffs complained against their former law partners for their expulsion from the firm, alleging damages resulting from a breach of their partnership agreement, breach of trust, and conspiracy; also against The Boeing Company (hereinafter referred to as Boeing) for alleged tortious interference with plaintiffs' contractual relationship with their former law partners, and conspiracy. Plaintiffs also commenced an action in King County Superior Court for an accounting after their expulsion; this action was terminated when plaintiffs took a voluntary nonsuit.

Plaintiffs appeal from a judgment based upon the grant-

ing of defendants' motions challenging the sufficiency of the evidence made at the close of plaintiff's case. We affirm.

Plaintiff Francis Holman joined the defendant law firm, of which his father was a senior partner, in 1941. He was made a partner in 1954 and has worked almost exclusively upon legal matters for Boeing, a firm client. Plaintiff William M. Holman joined the firm in 1949, and became a partner in 1957. During his early tenure he had done legal work for Boeing, but he had not done so for many years preceding the plaintiffs' expulsion from the law firm. Plaintiffs' father retired from the law firm in 1962, after a distinguished legal career.

The law firm, at the time of commencement of this action, consisted of 22 partners and other associates. Various partnership agreements had been entered into by the partners over the lifetime of this firm. Both plaintiffs were signators to the agreement controlling this action which was effective January 1, 1968. It provided, as had other previous agreements, that the business affairs of the partnership would be administered by an executive committee, comprised of 10 named partners. Both plaintiffs were members of this committee, which had the right to name new members and expel present members from the firm. The possibility of expulsion is mentioned in over a dozen different places throughout the partnership agreement. The agreement states that "any member may be expelled from the Firm by a majority vote of the Executive Committee," but does not specify whether expulsion shall be with or without cause or list any of the grounds for expulsion.

Subsequent to plaintiffs' association with the law firm, certain members left the firm to take executive positions with several of the corporate clients of the law firm, including Boeing. William M. Allen, who was a senior partner in the law firm at the time Francis Holman joined it, was the president of Boeing at the time of plaintiffs' expulsion. Likewise, during that period of time, James Prince left the law firm and accepted an executive position with Boeing, as had Lowell P. Mickelwait.

William Holman had, over a period of time, raised questions with the executive committee regarding the inadequacy of the legal rates which the firm charged the Boeing Company. He had also questioned other fee structures and the amount of "unchargeable time" accumulated by several of the senior partners for other than legal work. There was testimony by another member of the executive committee that, prior to the admission of William Holman to the executive committee, the committee's meetings had been pleasant, friendly, and characterized by a spirit of unselfishness and devotion to the best interests of the firm. However, after admission of the Holmans, there appeared to develop a polarization among the committee, with the Holmans on one side and the remainder of the committee on the other. There is also testimony which would indicate that a number of years prior to the expulsion some consideration had been given to requesting the Holmans to leave the firm. Plaintiffs characterized the discussions over Boeing's fees and other matters as those directly related to the business of the firm and matters which, of necessity, had to be discussed by the managerial committee. They were totally unaware that they were in any way polarizing the members of the committee.

In 1965, with the concurrence of the firm, Francis Holman ran for, and was elected to, the State House of Representatives. In 1968, he ran for, and was elected to, the Washington State Senate, without seeking the firm's approval—but no objection was made by any member of the firm. There apparently was some unexpressed disapproval relative to the amount of time consumed in legislative service, and the disproportionate money return, to wit $3,600 per year. In 1967, his percentage of income from the partnership business was reduced, because of the amount of time he was spending on legislative matters and in legislative service.

There is testimony that in March 1969, several of the officers of Boeing discussed, with several members of the

executive committee, a newspaper article[1] written by a political columnist, which characterized Senator Holman as a "tax reform maverick," and praised him for his independence from his client, principally Boeing. There is also testimony that in April 1969, the president of Boeing took issue with legal fees charged by Francis Holman for legal work which he had done for the company. Francis Holman had not been in charge of the billing for the particular work done, nor had he ever been notified of the complaint until after the lawsuit was commenced.

In mid-April 1969, Francis Holman made a speech before the State Senate regarding personal property tax legislation which was then before the Senate. There may have been some misstatement in the speech or in the reporting of it; in any event, the speech apparently served to aggravate several of the top officials of Boeing. The speech was not recorded; it was extemporaneous; consequently, there are several versions of exactly what was said. In any event, the following day, upon the request of another senator, one area of comment made during the prior day's speech was clarified by Senator Holman.

There was also an allegation by one Boeing executive that Francis Holman had exploited his attorney-client relationship with Boeing by using some of the information obtained as its attorney in commenting upon this legislation.[2]

---

[1] The article is not in evidence, but reference is made to it by testimony of witnesses.

[2] Excerpts from a deposition taken which were read into the record during the trial recite the following testimony by the managing partner of the law firm with respect to a telephone call he received from Mr. Mickelwait, vice-president of Boeing:

"I asked him for further particulars, and he said that on the 15th, again may I interject here, I cannot recall at this point the exact words, I am making my best attempt to put down on the record the gist and the important substance of the conversation. . . . he said he was particularly distressed that a member of our office would get up on the floor of the Senate and give to the Senate information about the Boeing Company that he, Mr. Francis Holman, knew or should have known was erroneous, and he was particularly distressed also because Mr. Francis Holman, in arguing

200

In April, preceding the speech, the president of Boeing advised the managing partner of the law firm that they desired Francis Holman to do no further legal work on their behalf. This had not been conveyed to Francis Holman, who was performing his legislative duties in Olympia.

On May 7, 1969, the executive committee—the only absent members being plaintiffs and one other member who was on a European trip—met for 9½ hours in the Olympic Hotel. The room was rented by Boeing on at least a semipermanent basis. Meals ordered by the members present on May 7 were charged to Boeing, a fact learned by the plaintiffs during discovery proceedings; after that discovery, the law firm reimbursed Boeing. Francis Holman was not notified of the meeting; William Holman had been informed earlier that there would be no executive committee meeting on May 7. The seven partners present discussed in detail whether the Holmans should be expelled from the law firm; the record shows the consensus favored expulsion, although neither a formal vote nor formal action was taken.

The 1969 legislative session ended May 12, 1969. Francis Holman returned home the next day about 6 p.m. He was

in favor of his position on SJR 1, had, in the argument, exploited his relationship with the law firm.

". . .

"Then he went into the latter part of his conversation in which he said something to this effect, he said, I don't care a rap about people from the Boeing Company or from your firm going down and voting as they choose on any particular Bill. He said, as a matter of fact, we have the voting record, not only of Mr. Francis Holman, but also the voting record of eight or nine other Boeing employees, he said. And he said this would demonstrate clearly they have voted, in a good many instances, against the position that the Boeing Company took on various measures. But, he said, I do definitely object to an individual, in order to further his own political career, and in order to further his own political interest, exploiting and flaunting his relationship with the law firm and the Boeing Company, and further giving out information which he knew or should have known was erroneous, and also, then, purporting to represent to the Senate that the information that he had given out and was giving out was correct because it was information that had come to him in his capacity as the lawyer for the Boeing Company."

then advised by his brother, William, of an executive committee meeting scheduled for 4 p.m. which had been recessed until 8 p.m. because of Francis Holman's absence; and that he had been advised it was particularly important that both Holmans be present.

William Holman surmised that they were about to be expelled, an impression which became a harsh reality when they appeared at the 8 p.m. meeting. The meeting was convened by the managing partner, who then read aloud a resolution which, without giving cause or reasons, expelled them from the partnership. When they asked the reasons for the resolution, none were stated. A vote was taken; by a 7-to-2 result the partners were expelled. It is this action which serves as the basis for the suit brought against the law firm and Boeing.

At the conclusion of the plaintiffs' evidence, and after lengthy argument, the trial court, in an extensive oral opinion, granted defendants' motion to dismiss on the ground of insufficiency of the evidence.

## INDIVIDUAL DEFENDANTS

Initially, we examine plaintiffs' position with respect to all the partners of the law firm. The trial court dismissed the action as to all partners of the law firm who were not members of the executive committee stating in its oral opinion that those partners had no power to act and that the record contained no evidence those partners did anything actionable. This was improper. By their partnership agreement, all partners had designated and authorized the executive committee as the managerial body of the firm. Inasmuch as each partner is responsible for the actions of every other partner, the delegation of the managerial function to certain members did not relieve the other partners of the responsibility for their acts. RCW 25.04.090; *Dygert v. Hansen*, 31 Wn.2d 858, 860, 199 P.2d 596 (1948). Therefore, we find that the dismissal of all partners except those comprising the executive committee was error. However, this is inconsequential unless the dismissal of the members of the executive committee was error.

We first examine plaintiffs' contention that there was substantial evidence to support the breach of contract action against the individual respondents which includes members of the executive committee. It is the general contention of the plaintiffs that the defendant partners breached the partnership agreement by the act of expulsion in (a) failing to give proper notice to the plaintiffs of executive committee meetings on May 7 and May 13, 1969; (b) expelling plaintiffs without cause; (c) failing to state the reasons for expulsion; and (d) failing to allow plaintiffs an opportunity to be heard.

The partnership agreement, section 1.2, states in part:

any member may be expelled from the Firm by a majority vote of the Executive Committee.

The agreement does not require giving of notice, a statement of reasons, a showing of good cause, or a hearing.

Likewise, section 1.3 in part states:

When any member . . . is expelled from the Firm, that fact shall be endorsed on the master copy of this agreement . . . , and the person involved shall no longer be a member of the Firm and his rights and obligations shall be as hereinafter stated.

Section 6.1 states that the "Day of Expulsion" is defined:

for purposes of the calculations, computations and determinations to be made hereunder, shall mean the close of business on the day immediately preceding the effective date of the . . . expulsion . . .

As to the notice of executive committee meetings, the executive committee on January 9, 1968, adopted rules governing its meetings and procedures entitled "Supplementary Rules of Procedure for Executive Committee." They provide, in part, for a regular monthly meeting of the committee, at 4 p.m., on Tuesday before the second Thursday of each month; that special meetings may be called by the managing partner; that written notice of each regular or special meeting, together with an agenda of matters to be covered, shall be prepared by the person or persons calling

the meeting and delivered to all members at least 2 days prior to the meeting.

Neither plaintiff was given notice of the meeting on May 7 in the Olympic Hotel. The trial court found that the meeting on May 7 was not a formal executive committee meeting, but was an informal gathering of members of the executive committee. The lack of notice to plaintiffs violated no legal duty to them. It was the trial court's opinion that to hold otherwise, at least inferentially, would abrogate any informal discussions the partners might have amongst themselves about other partners. We agree with the trial court.

Plaintiffs contend *Lycette v. Green River Gorge, Inc.*, 21 Wn.2d 859, 153 P.2d 873 (1944), supports their position that a meeting of the board of directors, *i.e.*, executive committee, is not legally constituted without notice to all directors, *i.e.*, members. *Lycette v. Green River Gorge, Inc., supra* at 863. Plaintiffs allege that their evidence raised questions of fact as to whether or not a decision had been made at the May 7 meeting which was merely carried into fruition on May 13, 1969. They contend the trial court, by ruling as a matter of law, usurped the function of the jury.

The facts here are distinguishable from *Lycette*. Plaintiffs' evidence does not indicate that any formal or binding action was taken by the executive committee on May 7 which would raise the informal meeting to the level of a formal meeting and thus necessitate notice. Here, the binding action of expulsion took place the following week, May 13, when a resolution was read and formally adopted by the executive committee. There was no showing any member of the executive committee was prohibited or precluded from voting against the resolution as presented on May 13. We conclude, and concur with the trial court that the meeting on May 7 was neither a formal meeting nor was action taken to commit those present to a course of action which could only be validated by subsequent ratification. *See Lycette v. Green River Gorge, Inc., supra* at 864. Thus, *Lycette* is distinguishable. Since it was an infor-

mal gathering, the supplementary rules of procedure for the executive committee, including the provision for notice therein, were not applicable.

█ Plaintiffs' claim that the meeting on May 13, 1969, was in violation of section 3 of the rules of procedure of the executive committee, which called for notice of meetings, together with an agenda of matters to be covered. These rules, while drawn for the orderly progression of business coming before the executive committee, were not, in effect, formal bylaws such as a corporation adopts. They must take subservience to the general partnership agreement where there is a conflict.

Paragraph 2.3 of the partnership agreement provides that notice is not a requisite to the validity of any meeting of the executive committee; consequently, the fact that plaintiffs had no advance notice of the meeting is of no effect.[3] It is true there was no agenda provided to plaintiffs prior to the May 13 meeting as is suggested or recommended by the supplementary rules. However, both plaintiffs testified that they believed their possible termination with the firm would be the subject of the 8 p.m. May 13 meeting; William Holman had been informed that afternoon that their relationship with the firm was to be a topic of discussion. We do not find the failure to provide an agenda was a sufficient violation of the partnership agreement to justify holding there was an unlawful expulsion of the plaintiffs.

Plaintiffs next urge that defendants' actions on May 13, 1969, violated requirements of due process of law in that they failed to give plaintiffs notice of expulsion, state reasons therefor, and provide plaintiffs with an opportunity to be heard. They contend there was substantial evidence that such requirements were within the intention of the signatory parties to the partnership agreement and can be implied, either from the circumstances, or as a matter of law.

As we have stated earlier, the partnership agreement did

---

[3]The same is true of the May 7 meeting and is a further reason why that meeting was not improper. Assuming arguendo that meeting was a formal meeting, no notice was required by the partnership agreement.

not set forth any method of procedure to be followed in an expulsion action. Plaintiffs, in fact, concede the agreement was silent as to any requirement of cause. Consequences of expulsion were detailed in the partnership agreement which provided a method of compensation upon expulsion. We must assume those provisions have been properly complied with in view of plaintiffs' acceptance of the accounting.[4]

Plaintiffs assert that it would be inconceivable to hold anyone bound by the expulsion provisions of this partnership agreement without expecting certain implied provisions of due process to be applicable. This contention is not supported by any evidence and, in fact, is contradicted by the very fact that 22 law partners, including plaintiffs, signed the agreement, even though it contained none of the requirements plaintiffs now contend must be implied. These are not people of limited knowledge, expertise, or proficiency in matters of law. The list of clients represented by the firm, the reputation of particular partners, and the length of service of the individual partners, particularly those of the executive committee, indicates they are knowledgeable in the substantive law and the drafting of instruments, including partnership agreements.

In this case the express language of the partnership agreement itself must be controlling; that language clearly does not contain any of the requirements plaintiffs now seek to assert as impliedly applicable. Where terms of a

---

[4] In *Blisset v. Daniel,* 68 Eng. Rep. 1022, 1027 (Ch. 1853), the court considered an expulsion clause comparable to the one in the instant case and concluded that it was one of the:

> most strict character, . . . one which requires no cause whatever to be expressed, or assigned, or entertained by the parties exercising it; . . . it has been exercised in that manner in this case, and without any cause whatever other than the will of the parties . . .

However, in that case, they found a lack of good faith in the manner in which the accounts had been rendered and held, in effect, the accounting had been rendered in a clandestine manner, and while the expulsion had actually been accomplished, the power of expelling them would not be carried into effect by the court.

contract, taken as a whole, are plain and unambiguous, the meaning is to be deduced from the contract alone. *Dickson v. Hausman,* 68 Wn.2d 368, 413 P.2d 378 (1966); *Hastings v. Continental Food Sales, Inc.,* 60 Wn.2d 820, 376 P.2d 436 (1962). We note further there is no evidence of the partners' intention at the time of drafting the present partnership agreement. They merely included the word "expulsion" without setting forth any requirements for executing such a procedure other than a vote of the executive committee. There is no evidence of any discussions held preparatory to drafting that instrument. There is no evidence concerning the utilization of the language set forth in the agreement in relation to the parties' intentions.

There is, however, testimony by William Holman as to his unexpressed understanding of these contractual provisions. Also, one partner, Mr. Anderson, stated that at the May 7 meeting he urged that plaintiffs were entitled to notice and that it would only be fair to notify them in advance of the actions contemplated by the executive committee. His position was rejected by the committee. Nevertheless, insofar as these statements are asserted to interpret or add to the agreement, they are not probative of the signators' intent at the time the agreement was executed. In effect, the trial court found, and we concur, that the parties intended the writing to be a complete and accurate integration of their previous agreement. *Nashem v. Jacobson,* 6 Wn. App. 363, 492 P.2d 1043 (1972).

As stated in A. Bromberg, *Crane and Bromberg on Partnership* § 74(d), at 426 (1968): "Expulsion provisions are rare because of each partner's fear that the others may gang up on him." As a consequence, there is very little law on the subject of expulsion. There is, however, case law involving partnership agreements which substantiates the proposition that additional requirements should not be added to unambiguous expulsion provisions.

*Smart v. Hernandez,* 95 N.H. 492, 66 A.2d 643 (1959), involved a physicians' partnership agreement which pro-

vided that in the event, "all of the other parties deem it desirable . . . that he retire as a member . . . he will upon written notice from them immediately sever his connection therewith . . ." The court at page 496 stated:

> We believe what the parties intended . . . was to provide a simple, practical and above all a speedy method of separating a partner for the interest of the Clinic. . . . To construe paragraph 12 as the defendant argues is to force upon the plaintiffs the very delays and uncertainties which all sought originally to avoid.

In *Gill v. Mallory,* 274 App. Div. 84, 80 N.Y.S.2d 155 (1948), a partnership agreement provided that once a determination had been made that it was not in the best interests of the firm for another partner to continue, such majority in interest "might give him written notice requiring him to withdraw from the partnership on a date to be specified in such notice, and that the effect would be the same as though he had voluntarily retired." There the court stated at page 85:

> [T]he purpose of this clause [was] to avoid, if possible, the legal proceedings involved in dissolution and winding up of the partnership if the members of the firm should find themselves in discord and unable to continue functioning harmoniously as a partnership. . . .
> . . . The plaintiffs' contention is that the majority decision was made selfishly and therefore not in good faith. We do not think that it was the purpose of the agreement to offer such an issue to be litigated whenever this clause in the agreement was availed of by a majority in interest. The purpose was to minimize litigation, not to create new issues to be tried in addition to those which would ordinarily be attendant upon dissolution.

In *McPherson v. J.E. Sirrine & Co.,* 206 S.C. 183, 33 S.E.2d 501 (1945), the partnership agreement contained a clause that, "The right to terminate the interest of any one of the partners is hereby vested in the other partners for any cause which in their discretion seems to be reasonable, . . ." The expelled partner brought an action and the court stated at page 205:

The contractual verbiage embraces the subject under discussion and involves no ambiguity in either purpose or respect. In almost every case of an involuntary ouster there would be the elements of a controversy. The contract plainly contemplates this.

This particular agreement required notice, and a vote of 75 percent of the partners' interest, to effect a change. The court continued to state:

It is not the province of the court to alter a contract by construction or to make a new contract for the parties; its duty is confined to the interpretation of the one which they have made for themselves, . . .

We find this partnership agreement to be unambiguous, and not to require notice, reasons, or an opportunity to be heard. To inject those issues would be to rewrite the agreement of the parties, a function we neither presume nor assume.

Plaintiffs also challenge the expulsion on the basis that there was substantial evidence that it was not bona fide, or in good faith, and contend such a requirement should be implied.

RCW 25.04.310 states: "Dissolution is caused: (1) . . . (d) By the expulsion of any partner from the business bona fide in accordance with such a power conferred by the agreement between the partners; . . ." The partnership agreement here at issue merely states that a partner may be expelled by majority vote of the executive committee with no provisions for cause, reasons, notice or hearing. "Bona fide" is defined as: "In or with good faith; honestly, openly, and sincerely; without deceit or fraud." Black's Law Dictionary 223 (4th ed. 1951).

■ Undoubtedly, the general rule of law is that the partners in their dealings with each other must exercise good faith.

The relation existing between copartners is one requiring the exercise of the utmost good faith. Each partner is a trustee for all, and no individual or group may take an unconscionable advantage of another.

*Danich v. Culjak,* 190 Wash. 79, 87, 66 P.2d 860 (1937); *see Karle v. Seder,* 35 Wn.2d 542, 214 P.2d 684 (1950); *cf. Jacobsen v. Arntzen,* 1 Wn. App. 226, 460 P.2d 295 (1969). In *Meinhard v. Salmon,* 249 N.Y. 458, 164 N.E. 545, 62 A.L.R. 1 (1928), Justice Cardozo stated at page 463:

> Joint adventurers, like copartners, owe to one another, . . . duty of the finest loyalty. Many forms of conduct permissible in a workaday world for those acting at arm's length, are forbidden to those bound by fiduciary ties. . . . Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior.

Likewise, a partner is not permitted to derive any profit or advantage from the partnership relationship except with the full knowledge and consent of the partners. *Karle v. Seder, supra; Page v. Page,* 55 Cal. 2d 192, 359 P.2d 41, 10 Cal. Rptr. 643 (1961). That such is the law cannot be questioned. For other cases imposing the duty of good faith in regard to the rights of others to a contract, *see Cominos v. Kalkanes,* 37 Wn.2d 843, 226 P.2d 863 (1951); *Millet v. Slocum,* 4 App. Div. 2d 528, 167 N.Y.S.2d 136 (1957); 60 Am. Jur. 2d *Partnership* § 115 *et seq.* (1972). However, the personal relationships between partners to which the terms "bona fide" and "good faith" relate are those which have a bearing upon the business aspects or property of the partnership and prohibit a partner, to wit, a fiduciary, from taking any personal advantage touching those subjects. *Rees v. Briscoe,* 315 P.2d 758 (Okla. 1957). Plaintiffs' claims do not relate to the business aspects or property rights of this partnership. There is no evidence the purpose of the severance was to gain any business or property advantage to the remaining partners. Consequently, in that context, there has been no showing of breach of the duty of good faith toward plaintiffs.

There is authority for plaintiffs' contention that the term "bona fide" or "good faith" requires more, *i.e.,* compliance with basic procedural due process standards. In every contract, including partnership agreements, there is an implied

covenant of good faith, fair dealing and cooperation by the parties to the contract. *Miller v. Othello Packers, Inc.*, 67 Wn.2d 842, 410 P.2d 33 (1966). While courts do not rewrite contracts for the parties, they do presume to interpret them in accordance with what the court finds to be the parties' intent. "Good faith" is defined as: "An honest intention to abstain from taking any unconscientious advantage of another, even through technicalities of law, together with an absence of all information, notice or benefit or belief of facts which render transaction unconscientious." Black's Law Dictionary 822 (4th ed. 1951).

An article in 33 *Conveyancer and Property Lawyer* (New Series), B. Davies, *The Good Faith Principle and the Expulsion Clause in Partnership Law* 32, 42 (1969), published in England, states in part:

> should the situation be one involving an "expulsion" . . . and the dispute . . . is determined by the majority partners, it is submitted that the application of the rules of natural justice are an essential legal prerequisite in the determination of the partnership dispute. This is so because partners in this circumstance are acting as a "tribunal or body of persons invested with authority to adjudicate upon matters involving civil consequences to individuals."

The article concludes that prior to expulsion, a partner is entitled to notice, the reasons, and a hearing, much as has been found by our courts under the phrase "due process of law."

We choose not to follow Mr. Davies. These parties in writing the partnership clauses dealing with expulsion, and the defendants who carried them out, chose to adopt the guillotine approach, rather than a more diplomatic approach, to the expulsion of partners. The actions of defendants were within the contemplation of the agreement. While this course of action may shock the sensibilities of some, to others it may be that once the initial decision is made, the traumatic reaction to that decision is more quickly overcome and the end result more merciful. How-

ever that course of action may appear to the reader, the possibility of exactly such action occurring is clear from reading the agreement. None of the partners had any reason to believe the agreement required anything more prior to abruptly and brusquely terminating their services.

Plaintiffs contend there was substantial evidence indicating the individual partners breached fiduciary duties they owed to plaintiffs as members of the bar. In view of our holding that the executive committee had the right to expel plaintiffs without stating reason or cause pursuant to the partnership agreement, there was no breach of any fiduciary duty.

We conclude that these parties contractually agreed to the very method of expulsion exercised by the defendants, i.e., a clean, quick, and expeditious severance, with a clear method of accounting. It is not difficult to understand why parties to such a professional relationship would find this method desirable. This case, which has consumed nearly 4 years of litigation, and the attendant publicity, illustrates the virtues of this method of expulsion. The foundation of a professional relationship is personal confidence and trust. Once a schism develops, its magnitude may be exaggerated rightfully or wrongfully to the point of destroying a harmonious accord. When such occurs, an expeditious severance is desirable. To imply terms not expressed in this partnership agreement frustrates the unambiguous language of the agreement and the result contemplated.

We affirm the trial court's dismissal of the defendant partners.

### The Boeing Company

Plaintiffs' allegation that Boeing tortiously interfered with plaintiffs' contractual relations with their law partners is not well taken.

The elements for the tort . . . have been repeatedly stated by this court as:
(1) the existence of a valid contractual relationship or business expectancy; (2) knowledge of the relationship or expectancy on the part of the interferor; (3) inten-

tional interference inducing or causing a breach or termination of the relationship or expectancy; and (4) resultant damage to the party whose relationship or expectancy has been disrupted.

*Calbom v. Knudtzon,* 65 Wn.2d 157, 162, 396 P.2d 148 (1964). *See also, F. D. Hill & Co. v. Wallerich,* 67 Wn.2d 409, 407 P.2d 956 (1965); *Corinthian Corp. v. White & Bollard, Inc.,* 74 Wn.2d 50, 442 P.2d 950 (1968).

*Scymanski v. Dufault,* 80 Wn.2d 77, 82, 491 P.2d 1050 (1971).

The first two elements may be conceded; as evidenced by the previous discussion, there was a partnership agreement and Boeing knew plaintiffs were partners in the law firm and members of the executive committee.

Issue is taken with the third element, *i.e.,* intentional interference inducing or causing termination of the relationship or expectancy.

Interference is defined as "the act or process of interfering . . . the act of meddling in or hampering an activity or process"; interfere is defined as "[T]o enter into or take apart in the concerns of others." *Webster's Third New Int'l Dictionary* 1178 (1969). Plaintiffs contend the following evidence is sufficient to require this issue to go to the trier of fact:

1. There existed a special relationship between Boeing and the law firm, in that three former partners of the firm held top executive positions with Boeing. Those positions were president, chairman of the board, chief executive officer; senior vice-president and corporate secretary; and vice-president. Close personal and professional contact was maintained between members of the firm and these officers in both the social and business context.

2. The executive committee extended to Boeing preferential treatment regarding legal fees; per diem rates were lower than the rates charged its other clients.

3. At least two of the Boeing executives were aware: (a) that plaintiffs were the strongest proponents advocating an upgrading of the Boeing fee schedule; (b) that Francis

Holman was gaining a reputation as an independent legislator, free of restraint from his law clients, *i.e.*, Boeing.

4. On April 1, 1969, after the news article classifying Senator Holman as a tax maverick, the president of Boeing called the managing partner of the law firm and over lunch advised him that Boeing wanted Francis Holman removed from all Boeing legal work. Plaintiffs contend Boeing's request that Francis Holman no longer perform legal work for them is not because of the fees he charged—that being a mere contrivance. As stated in appellants' brief on page 48:

> [T]he real reason for Allen's order was that he was so antagonized by the position of both appellants regarding the cut rate fees being charged to Boeing and by Senator Holman's legislative positions, that he simply decided that both appellants must be rendered powerless to continue.

5. Late in April, after Senator Holman's speech on the floor of the Senate, the three Boeing executives, who were former law partners, were highly agitated by what they understood to be the contents of the speech. One of them then telephoned the managing partner, stating in part, that some of the information contained in the speech came to Senator Holman by reason of his being a lawyer for the company and obtained as a result of that relationship. Plaintiffs contend this statement was not true.

6. Between the time of the speech, and May 7, the managing partner had discussed the Boeing reaction to the speech with at least some members of the executive committee. One member who was going on vacation in late April wrote a memo regarding his position toward the expulsion of plaintiffs. Another member of the executive committee had subsequently returned from vacation and did attend the May 7 meeting.

7. The May 7 meeting was held in a hotel room rented to Boeing, which was used for "things" that involved Boeing. The bill for meals consumed at that meeting was signed for by the managing partner on behalf of Boeing.

Finally, plaintiffs contend that whether Boeing ordered the firm to expel plaintiffs or only that they be removed from all Boeing's work is "a distinction without a difference." Boeing had an absolute right to request the firm to not allow Francis Holman to perform any legal work for it. *Kimball v. PUD 1*, 64 Wn.2d 252, 391 P.2d 205 (1964); *Dill v. PUD 2*, 3 Wn. App. 360, 475 P.2d 309 (1970).

Interference is the act of meddling or entering into concerns of others. Here, the act of interfering culminates in the telephone call made to the managing partner by a Boeing executive after the speech upon the Senate floor. However, Boeing still retained this law firm. In the opinion of the company, rightfully or wrongfully, its economic interest was being threatened by the acts of a member of that firm. Boeing had a right to complain or protest that person's action to the management of the firm. We cannot infer any additional conversation, there being none of record other than as reflected in note 2. The evidence presented does not create a valid inference that Boeing told the firm what actions they should take with regard to the plaintiffs; nor can one go a step further and infer that if they didn't take action to expel plaintiffs, the Boeing business would go elsewhere.

Assuming arguendo that a trier of fact could decide the reasons given by Boeing for removing Francis Holman from doing Boeing's legal work were not credible, all that would remain would be speculation and suspicion as to what the true reasons were or the extent of Boeing's involvement in the expulsion. *Cf. Jones v. Leslie*, 61 Wash. 107, 112 P. 81, 48 L.R.A. (n.s.) 893 (1910); *Sears v. Teamsters Local 524*, 8 Wn.2d 447, 112 P.2d 850 (1941). Suspicion, speculation or conjecture are insufficient to support a factual determination in favor of the plaintiffs. *Sortland v. Sandwick*, 63 Wn.2d 207, 386 P.2d 130 (1963); *Lamphiear v. Skagit Corp.*, 6 Wn. App. 350, 493 P.2d 1018 (1972).

Plaintiffs contend that the discovery of this much evidence was an uphill battle; further, when dealing with

individuals who are as sophisticated as the people involved here, the possibility of obtaining direct evidence is practically nil. Thus, they invite the court to be more lenient in projecting inferences from circumstantial evidence. We disagree. The burden of proof lies with the party instituting the action. That burden must remain constant.

 Admittedly, the defense of justification or privilege rests upon the alleged interferor. *Scymanski v. Dufault, supra* at 87; *Calbom v. Knudtzon,* 65 Wn.2d 157, 163, 396 P.2d 148 (1964). But here it is Boeing's business interest, and their attorney-client relationship, to which Boeing rightfully or wrongfully was directing its complaint. That complaint was being made to its lawyers. This is a valid and justifiable interference. 4 Restatement of Torts § 766-74 (1939). As the trial court so aptly noted, there was no showing of improper interference, but merely suspicion and assumptions on behalf of plaintiffs.

We affirm the trial court. There is insufficient evidence to justify the submission of the issue of interference with the business relationship to the jury; and further, based upon this evidence, Boeing had a justifiable right to register a complaint with the law firm.[5]

## CONSPIRACY

 Lastly, the plaintiffs claim the defendants conspired together to cause their expulsion and subsequent damage. The test of the sufficiency of evidence in the matter of conspiracy is that the facts and circumstances relied upon must be inconsistent with a lawful or honest purpose, and reasonably consistent with the existence of a conspiracy. *Baun v. Lumber Workers Local 2740,* 46 Wn.2d 645, 284 P.2d 275 (1955). Where mere suspicion is raised by the evidence, there is not a sufficient basis to support a finding of conspiracy. *Corbit v. J.I. Case Co.,* 70 Wn.2d 522, 424 P.2d 290 (1967); *see also* 45 Am. Jur. 2d *Interference* § 50

---

[5]Boeing further contends that a client has an absolute right to require a firm to expel a partner or terminate an employee in exchange for its business. We do not reach this question; nor was it considered inasmuch as no authority was cited for that proposition.

(1969). Since we have found plaintiffs failed to produce substantial evidence to support their other allegations, the conspiracy count must likewise fall.

We therefore conclude there was insufficient evidence to support a verdict against any of the defendants; the judgment of the trial court is affirmed.

GREEN, C.J., and MCINTURFF, J., concur.

Petition for rehearing denied June 13, 1974.

Review denied by Supreme Court October 24, 1974.