Gerald L. **LAWLIS**, Appellant
(Plaintiff Below),

v.

**KIGHTLINGER & GRAY**, an Indiana Partnership; Robert J. Wampler; John N. Thompson; John T. Lorenz; Donald L. Dawson; Ronald A. Hobgood; Mark William Gray; and Peter G. Tamulonis, Appellees (Defendants Below).

No. 73A04–9002–CV–101.

Court of Appeals of Indiana,
Fourth District.

Nov. 14, 1990.

Rehearing Denied Dec. 13, 1990.

---

Robert G. Barker, Jerry Garau, Price & Shula, Indianapolis, for appellant.

Arthur P. Kalleres, Ice, Miller, Donadio & Ryan, Indianapolis, for appellees.

CONOVER, Judge.

Plaintiff–Appellant Gerald L. Lawlis (Lawlis) appeals the Shelby Circuit Court's entry of summary judgment in favor of Defendants–Appellants Kightlinger & Gray, an Indiana partnership, Robert J. Wampler, John N. Thompson, John T. Lorenz, Donald L. Dawson, Ronald A. Hobgood, Mark William Gray, and Peter G. Tamulonis (partnership) in a suit for wrongful expulsion of a partner from the partnership.

We affirm.

This appeal presents the following issues:

1. whether there are genuine issues of material fact as to whether the partnership

 a. breached the partnership agreement,

 b. breached a fiduciary duty owed to Lawlis,

 c. was guilty of constructive fraud as to Lawlis, and

 d. breached an oral contract by expelling Lawlis.

The partnership for many years has practiced law in Indianapolis and Evansville under various firm names. Lawlis initially became an associate of the partnership in 1966 but resigned after three years to join the staff of Eli Lilly and Company as an attorney. In early 1971, the partnership offered Lawlis a position as a general partner and Lawlis accepted. He signed his first partnership agreement as a general partner in 1972. That agreement remained effective until a new one was executed by the partners, including Lawlis, in 1984. Both these agreements provided for partnership compensation based upon a unit system, i.e., partners participated in the profits according to the number of units assigned to them each year by the partnership. Lawlis became a senior partner in 1975 and continued to practice law with the firm without interruption until 1982.

In that year, Lawlis became an alcohol abuser, and due to that affliction did not practice law for several months in early 1983 and in mid 1984. During each of these periods, he sought treatment for his alcoholism. (R. 11). Lawlis did not reveal his problem with alcohol to the partnership until July of 1983 when he disclosed it to the partnership's Finance Committee. When he did so, it "promptly contacted and met as a group with a physician who had expertise in the area of alcoholism." It then drafted "a document entitled 'Program Outline' which set forth certain conditions for Lawlis' continuing relationship with the Partnership." (R. DeTrude Aff., p. 4 ¶ 12–13). That document, signed by

Lawlis in August, 1983, contained the following understanding: "3. It must be set out and clearly understood that there is no second chance." (R. Lawlis Aff., Exh. B-1). By March, 1984, Lawlis had resumed the consumption of alcohol. Lawlis again sought treatment, and the firm gave Lawlis a second chance.

Its Finance Committee then decided Lawlis would be required to meet specified conditions in order for his relationship with the partnership to continue. These conditions included meetings with specialists selected by the partnership, treatment and consultation regarding his problem, and the obtaining of favorable reports from the specialist as to the likelihood of a favorable treatment outcome. Lawlis was told he would be returned to full partnership status if he complied with the conditions imposed. He has not consumed any alcoholic beverages since his second treatment in an alcoholic clinic in March, 1984.

Two written partnership agreements embodying primarily the same provisions were in effect in 1982 and thereafter, executed in 1972 and 1984, respectively. Lawlis executed both agreements and each annual addendum thereto along with all the other partners of the firm. Under the 1984 agreement, the senior partners by majority vote were to determine (a) the units each partner annually received, (b) the involuntary expulsion of partners, and (c) the involuntary retirement of partners. (R. 24–26).

As Lawlis battled his problem, his units of participation yearly were reduced by the annual addendum to the partnership agreement. Because he had not consumed alcohol since his second trip to a clinic and had been congratulated by senior partner Wampler, a member of the Finance Committee, and several others as to his "100% turn around," Lawlis felt "a substantial restoration of my previous status was past due." So believing, he met with the Finance Committee on October 1, 1986, and proposed his units of participation be increased from his then 60 to 90 units in 1987.

On October 23, 1986, Wampler told Lawlis the firm's Finance Committee was going to recommend Lawlis's relationship as a senior partner be severed no later than June 30, 1987. Two days later, all the firm's files were removed from Lawlis's office. The severance recommendation was presented at the 1986 year-end senior partners meeting. All except Lawlis voted to accept the Finance Committee's recommendation. At that time, as the Finance Committee also had recommended, Lawlis was assigned one unit of participation for the first six months of 1987 to a maximum total value of $25,000 on a weekly draw. This arrangement permitted Lawlis to retain his status as a senior partner to facilitate transition to other employment and to give him continuing insurance coverage.

Lawlis refused to sign the 1987 addendum containing those provisions and retained counsel to represent his interests. In consequence, he was expelled by a seven to one vote of the senior partners at a meeting held on February 23, 1987. (Lawlis cast the lone dissenting vote.) Article X of the 1984 agreement requires a minimum two-thirds vote of the senior partners to accomplish the involuntary expulsion of a partner. (R. 28). Lawlis filed suit for damages for breach of contract. From the entry of an adverse summary judgment, Lawlis appeals.

When reviewing the grant of summary judgment, we stand in the shoes of the trial court and apply an identical standard. *Ayres v. Indian Heights Volunteer Fire Department* (1986), Ind., 493 N.E.2d 1229, 1234. Summary judgment is appropriate only where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *Beckett v. Clinton Prairie School Corporation* (1987), Ind., 504 N.E.2d 552, 553. Any doubt as to the existence of a genuine issue of fact must be resolved in favor of the nonmovant. *Morgan v. Southern Indiana Bank & Trust Co.* (1985), Ind.App., 473 N.E.2d 158, 160. In determining whether there is a genuine issue of material fact precluding summary judgment, all doubts must be resolved against the moving party and the facts set forth by the party opposing the

motion must be accepted as true. *Progressive Construction & Engineering Co., Inc. v. Indiana & Michigan Electric Co., Inc.* (1989), Ind.App., 533 N.E.2d 1279, 1284. Even if the facts are undisputed, summary judgment is inappropriate when evidence before the Court reveals a good faith dispute as to the inferences to be drawn from such facts. *Four Winns, Inc. v. Cincinnati Insurance Co., Inc.* (1984), Ind.App., 471 N.E.2d 1187, 1189.

 However, factual disputes that are irrelevant or unnecessary will not be considered. *Owen v. Vaughn* (1985), Ind. App., 479 N.E.2d 83, 87. A factual issue is "genuine" only when it cannot be foreclosed by reference to undisputed facts and requires a trier of fact to resolve the opposing parties' differing versions. *Perry v. NIPSCO* (1982), Ind.App., 433 N.E.2d 44, 46.

 Lawlis first claims[1] his notification by Wampler on October 23, 1986, that the Finance Committee would recommend his severance as a partner coupled with the removal of all partnership files from his office two days later constituted an IND. CODE 23–4–1–29 dissolution of the partnership. At that time, he posits he ceased "to be associated in the carrying on as distinguished from the winding up of the business." Deeming such expulsion wrongful because not authorized by a two-thirds vote of the senior partners at that time, Lawlis asserts he has a claim for damages against the partners under IC 23–4–1–38(a)(2) for dissolution in contravention of the partnership agreement. We disagree.

It is readily apparent Wampler merely told Lawlis what the Finance Committee proposed to do in the future. No dissolution occurred on that account. That the firm's files were removed from Lawlis's office two days later is immaterial. After their removal, Lawlis still participated in the partnership's profits through a weekly draw even though he evidently had nothing to do.

Finally, the undisputed facts clearly demonstrate there was a meeting of the minds he would remain a senior partner after October 23, 1986. The partnership continued to treat Lawlis as a senior partner after that date. The Finance Committee's memorandum of November 25, 1986, regarding Lawlis's partnership status, proposed for 1987 he be given a weekly draw on one unit of participation until June 30, 1987, at which time his relationship with the firm would terminate, unless he withdrew earlier. Further, that committee's minutes for its December 23, 1986 meeting regarding the change in letterhead show Lawlis's name was not to be removed from the letterhead, it was to be placed at the bottom of the list of partners.

Also, Lawlis considered himself to be a senior partner after October 26, 1986. He refused as a senior partner to sign the proposed 1987 addendum "which implemented the decisions made by the Finance Committee concerning Lawlis," Appellant's Brief, p. 8; (R. at Exhibit 1, Lawlis Aff., p. 5), and cast the lone dissenting vote on his expulsion at the meeting of the senior partners held on February 23, 1987. Article X of the partnership agreement provides:

*Expulsion of a Partner*

A two-thirds (⅔) majority *of the Senior Partners*, at any time, may expel any partner from the partnership *upon such*

---

**1.** The partnership asserts parol evidence is not admissible because the partnership agreement evidences an intent to have that writing provide the complete information regarding governance of the partnership, i.e., the contract is integrated. This is an important issue because all of Lawlis's claims are dependent upon parol evidence. However, this partnership agreement is not integrated because it contains no true integration clause.

Such clauses express the parties' intention that all prior negotiations, representations, previous communications, and the like are either withdrawn, annulled, or merged into the final written agreement. Although an integration clause is a valuable drafting technique when all the parties involved intend such a clause be included in their contract, *see Franklin v. White* (1986), Ind., 493 N.E.2d 161, 166, no such language appears in the partnership agreement here at issue. Thus, parol evidence is admissible.

*terms and conditions as set by said Senior Partners....* (Emphasis supplied).

Only a partner could refuse to sign the proposed 1987 addenda after its tender by the firm to Lawlis for signature, and only a senior partner could vote on the Finance Committee's proposal to expel a partner under the partnership agreement. The undisputed facts disclose Lawlis remained a senior partner of the firm until he was expelled as such by vote of the senior partners on February 23, 1987.

Further, the time a dissolution occurs under these circumstances is clearly defined by statute. The Indiana Uniform Partnership Act at IC 23–4–1–31 says:

Sec. 31. Dissolution is caused: (1) Without violation of the agreement between the partners, ...

(d) By the expulsion of any partner from the business bona fide in accordance with such a power conferred by the agreement between the partners.

Lawlis was expelled in accordance with the partnership agreement on February 23, 1987. Thus, dissolution occurred on that date, not when he was notified of the proposal to expel him. Lawlis has no claim for damages under IC 23–4–1–38(a)(2).

Lawlis next argues his expulsion contravened the agreement's implied duty of good faith and fair dealing because he was expelled for the "predatory purpose" of "increasing [the firm's] lawyer to partner ratio," as evidenced by the Finance Committee's proposal contained in its November 25, 1986, memo to partners regarding the 1986 year end meeting. The partnership, however, posits Indiana does not recognize a duty of good faith and fair dealing in the context of an at will relationship.

It would be a simple matter to extrapolate the principle that an employer may terminate an at will employee for any cause or no cause without liability and apply it to the roughly comparable at will business relationship we find here, namely, the relationship existing between the partnership as an entity and its individual partners. The Indiana Uniform Partnership Act, however, prevents us from so doing.

As noted above, when a partner is involuntarily expelled from a business, his expulsion must have been "bona fide" or in "good faith" for a dissolution to occur without violation of the partnership agreement. IC 23–4–1–31(1)(d). Said another way, if the power to involuntarily expel partners granted by a partnership agreement is exercised in bad faith or for a "predatory purpose," as Lawlis phrases it, the partnership agreement is violated, giving rise to an action for damages the affected partner has suffered as a result of his expulsion.

Lawlis finds a predatory purpose in the Finance Committee's November 25, 1986, memo to the partners by quoting portions of the memo's section "4. *FIVE YEAR PLAN*, Firm Growth and Financial Goals." He states:

The five-year plan stated that, "The goal is to increase the top partners to at least $150,000 within the next two to three years.... In order to achieve the goal, we need to continue to improve our lawyer to partner ratio." R. at Exhibit 1, Lawlis Affidavit, Exhibit B–3.

Appellant's Brief, at 17. From that quote Lawlis reasons:

Obviously, the easiest way for the Partnership to improve its lawyer to partner ratio, and thus increase the top partners' salaries, was to eliminate a senior partner. Lawlis' position in the Partnership had been weakened by his absences due to illness. The remaining partners knew this and pounced upon the opportunity to devour Lawlis' partnership interest.

Appellant's Brief, at 18. The undisputed facts demonstrate the total inaccuracy of the final sentence quoted from appellant's brief.

From the time Lawlis's addiction to alcohol became known to the partnership's Finance Committee, it sought to assist and aid him through his medical crisis, even though he was taking substantial amounts of time off from his work to attempt cures in sanatoriums and had concealed the fact

of his alcoholism from his partners for many months. The firm permitted him to continue drawing on his partnership account even though he became increasingly unproductive in those years, as reflected by the continuing yearly drop in the number of units assigned him. After signing the Program Outline in August, 1983, which structured his business life by providing among other things for the monitoring of his work product by the firm for a period of one year, recommending he attend Alcoholics Anonymous meetings, setting the specific times he would arrive at and remain in the office, and containing a provision "3. ... there is no second chance," Lawlis "resumed the consumption of alcohol" in March, 1984. (R. Lawlis Aff., at ¶ 16). Instead of expelling Lawlis at that time, the partnership acting through its Finance Committee continued to work with Lawlis by drawing up yet another set of conditions he was to meet to remain with the firm. Clearly, these undisputed facts present no "predatory purpose" on the firm's part, nor does the Finance Committee's Five Year Plan when that proposal is read in full.[2]

In essence, the proposal was to change the manner in which the firm valued its performance, and to obtain more production, i.e., billable hours from the attorney associates working for the firm in its various departments to achieve its goal of increased income to the partners. There is no proposal that the number of partners be reduced to accomplish the Five Year Plan's stated goals, nor any reasonable inference arising therefrom to that effect.

Also, in the same memo at 1. PARTNER STATUS, A. *Senior Partners*, the Finance Committee, instead of recommending Lawlis's immediate expulsion as a method of increasing its lawyer to partner ratio, proposed he remain a partner for a maximum total of an additional eight months to give him time to find other employment and retain insurance coverage while so engaged. During that period it proposed he be permitted one participation unit upon which to draw up to $25,000 while he sought other employment. Such proposal again clearly negates a partnership "predatory purpose" for Lawlis's expulsion. Thus, there is no "genuine" issue as to whether the partnership acted in good faith when it expelled Lawlis because it can be foreclosed by reference to the undisputed facts here. *Perry*, 433 N.E.2d, at 46.

Lawlis next claims the partnership breached the fiduciary duty owed to him as a partner in the firm by expelling him for the predatory purpose of increasing partner income, but acknowledges that fiduciary duty is "intertwined with the duty of good faith and fair dealing." We discuss the good faith issue at length below in connection with our discussion of constructive fraud.

■ Lawlis next argues the firm's act of expelling him was constructively fraudu-

2. It reads as follows:

### 4. FIVE YEAR PLAN
#### Firm Growth and Financial Goals

We need to establish goals for the next five years in order to have bench marks for measuring progress.

The ultimate goal should be to increase partner income. The cost of living has almost doubled since 1976. The income of partners has not kept pace with those increases and we must institute corrective measures to bring the income levels more in line with today's costs.

The goal is to increase the top partners to at least $150,000 within the next two to three years.

In order to achieve the goal we need to continue to improve our lawyer to partner ratio and improve our profit per partner to production per lawyer ratio.

In the past we have looked to unit value and expense ratio to judge our performance. Unit value has validity, but by increasing payroll for associates the expense ratio is adversely affected, which gives a misreading. A less percent of profit but higher grosses can result in higher unit values.

A 60% expense factor is acceptable if increased expense give a higher ratio of lawyers to partners and thereby increases gross income.

The key word for the coming years is "accountability". Each of our departments will be held accountable with regard to minimum billable hours and reasonable production goals. If any department is unable to meet its obligation with the work it has to do, the consideration will be given to expanding the areas covered by the department or, in the alternative, reducing the number of attorneys assigned to the department, and thereby adjust the billable hours and production required.

lent because it constituted a breach of the fiduciary duty owed between partners which.requires each to exercise good faith and fair dealing in partnership transactions and toward co-partners. *Given v. Cappas* (1985), Ind.App., 486 N.E.2d 583, 590. While we agree with Lawlis's bald statement of that concept, it has no application to the facts of this case.

The fiduciary relationship between partners to which the terms "bona fide" and "good faith" relate

> ... concern the *business aspects* or *property of the partnership* and prohibit a partner, to-wit a fiduciary, from taking any personal advantage touching those subjects. Plaintiffs' claims do not relate to the business aspects or property rights of this partnership. There is no evidence the purpose of the severance was to gain any business or property advantage to the remaining partners. Consequently, in that context, there has been no showing of breach of the duty of good faith toward plaintiffs.... Plaintiffs contend there was substantial evidence indicating the individual partner's breach of fiduciary duties they owed to plaintiffs as members of the bar. In view of our holding that the executive committee *had the right to expel plaintiffs without stating a reason or cause pursuant to the Partnership Agreement, there was no breach of any fiduciary duty.* (Emphasis supplied).

*Holman v. Coie* (1974), 11 Wash.App. 195, 522 P.2d 515, 523–524. *Holman* concerned the expulsion of two partners from a law firm for no stated cause, but there was evidence a political speech by one of them had disgruntled the chief executive of one of the firm's major clients, the Boeing Corporation. Substantially the same consideration present in *Holman*, i.e., potential damage to partnership business, is present in this case.

▪ A partnership is by definition "an association of two (2) or more persons to carry on as co-owners a business *for profit.*" IC 23-4-1-6(1). The lifeblood of any partnership contains two essential ingredients, cash flow and profit, and the prime generators of that lifeblood are "good will" and a favorable reputation. The term "good will" generally is defined as the probability that old customers of the firm will resort to the old place of business where it is well-established, well known, and enjoys the fixed and favorable consideration of its customers. *SCA Services of Indiana, Inc. v. Thomas* (D.C.Ind.1986), 634 F.Supp. 1355, 1363; 14 I.L.E. *Good Will* § 1, West Publ. Co., 1959. An equally important business adjunct of a partnership engaged in the practice of law is a favorable reputation for ability and competence in the practice of that profession. A favorable reputation not only is involved in the retention of old clients, it is an essential ingredient in the acquisition of new ones. Any condition which has the potential to adversely affect the good will or favorable reputation of a law partnership is one which potentially involves the partnership's economic survival. Thus, if a partner's propensity toward alcohol has the potential to damage his firm's good will or reputation for astuteness in the practice of law, simple prudence dictates the exercise of corrective action, as in *Holman*, since the survival of the partnership itself potentially is at stake.

All the parties involved in this litigation were legally competent and consenting adults well educated in the law who initially dealt at arm's length while negotiating the partnership agreements here involved. At the time the partners negotiated their contract, it is apparent they believed, as in *Holman*, the "guillotine method" of involuntary severance, that is, no notice or hearing, only a severance vote to terminate a partner involuntarily need be taken, would be in the best interests of the partnership. Their intent was to provide a simple, practical, and above all, a speedy method of separating a partner from the firm, if that ever became necessary for any reason. We find no fault with that approach to severance.

▪ Where the remaining partners in a firm deem it necessary to expel a partner under a no cause expulsion clause in a partnership agreement freely negotiat-

ed and entered into, the expelling partners act in "good faith" regardless of motivation if that act does not cause a wrongful withholding of money or property legally due the expelled partner at the time he is expelled. Used in this context, "good faith" means

> ... a state of mind indicating honesty and lawfulness of purpose: belief in one's legal title or right: belief that one's conduct is not unconscionable ...: absence of fraud, deceit, collusion, or gross negligence....

*Webster's Third New International Dictionary*, G. & C. Merriam and Co., 1976. Clearly, the senior partners acted in the belief they had the legal right to do so under the partnership agreement, as they did. That they recommended a step-down severance over six months rather than the "guillotine" severance permitted them under the agreement demonstrates a compassionate, not greedy, purpose. If we were to hold otherwise, we would be engrafting a "for cause" requirement upon this agreement when such was not the intent of the parties at the time they entered into their agreement. Mere lapse of time, however long, does not alter that initial intent. Lawlis's constructive fraud argument is without merit.

Finally, Lawlis claims the partnership violated an oral agreement he would be restored to full partner status if he quit drinking and again became a fully productive partner. Passing the question of whether his promise to so perform constituted a promise to do only what he was already bound to do under the original agreement and thus not sufficient consideration to support another contract, it is undisputed Lawlis was never downgraded to associate status. He was at all times prior to his expulsion a senior partner as contemplated by the partnership agreement. His consent to a reduction in his participation units in 1984, 1985, and 1986, is evidenced by his signing of those addenda to that agreement. Also, where one has full knowledge of an alleged fraud in the inducement yet acts in a manner which shows an intent to confirm the contract, he waives any claim for damages relating to

such alleged misrepresentation. *St. John v. Hendrickson* (1882), 81 Ind. 350, 354; *Craig v. ERA Mark Five Realtors* (1987), Ind.App., 509 N.E.2d 1144, 1147; *Smart & Perry Ford Sales, Inc. v. Weaver* (1971), 149 Ind.App. 693, 274 N.E.2d 718, 724. Lawlis's contention in this regard is also meritless.

Affirmed.

MILLER, P.J., concurs.

GARRARD, J., concurs in result.