The CITY OF EVANSVILLE,
Indiana, Appellant,

v.

Gregory S. CONLEY, Steven Kuehn, Glenn Linville, William L. Wilson, Ron Tabor, Ron Krepps, Mike Martin, Phillip Garrison and Randy Damm, Appellees.

John L. CRADDOCK, Del Cato, William D. Dickinson, Sr., Marvin C. Buente, II, Art Steiner and Leander Williams, Appellants,

v.

The CITY OF EVANSVILLE,
Indiana, Appellees.

No. 74A05–9502–CV–50.

Court of Appeals of Indiana.

Feb. 15, 1996.

Transfer Denied June 26, 1996.

David Bunner, Evansville, for City of Evansville.

Charles L. Berger, Berger & Berger, Evansville, R. Lawrence Daly, Wright Evans & Daly, Evansville, for Appellants John L. Craddock, Del Cato, William D. Dickinson, Sr., Marvin C. Buente, II, Art Steiner and Leander Williams.

Charles L. Berger, Berger & Berger, Evansville, Indiana, R. Lawrence Daly, Wright Evans & Daly, Evansville, Indiana, for Appellees Gregory S. Conley, Steven Kuehn, Glenn Linville, William L. Wilson, Ron Tabor, Ron Krepps, Mike Martin, Phillip Garrison and Randy Damm.

## OPINION

SHARPNACK, Chief Judge.

This case represents the consolidation of two related appeals. Two groups of firemen sued the City of Evansville ("city") for an alleged improper demotion based upon political affiliation; one group of firemen won the litigation and one group lost. Thus, the first appeal is the city's appeal of the judgment in favor of the Appellee–Plaintiff firemen ("appellees"). The second appeal is the Appellant–Plaintiff firemen ("appellants"), who appeal the judgment in favor of the city. We affirm.

Because both cases rely on the same underlying facts and the same record, we will set out those facts most favorable to the judgments first and then take each case individually. All of the firemen were employed by the Evansville Fire Department (the "department"). The firemen were either appointed or promoted under the Republican Mayor Russell B. Lloyd based on their political affiliation. Prior to a change of law in 1977, the department had operated under a "spoils system", in which individuals were appointed to ranking positions based upon political patronage or affiliation. However, in 1977 a new law prohibited the demotion of firemen based upon political affiliation or preference.

On January 1, 1980, Democrat Michael D. Vandeveer took office as mayor. Vandeveer named John Behme as the chief of the department. At this time, virtually all ranking officers of the department were Republicans or had received their rank during the Republican administration. Sometime prior to taking office, Vandeveer learned of the change in the law. None-the-less, Vandeveer received pressure from Democratic office holders and firemen who sought appointments to the department. As a result, Vandeveer supported the introduction of new legislation which would enable him to appoint more Democrats into ranking positions. At about this same time, Vandeveer appointed the Evansville Board of Public Safety (the "board"), which acted as the governing body for the

department. The mayor appointed two Democrats and one Republican to the board.

By the middle of March, 1980, approximately fifty-five ranking officers of the department had resigned their rank. Most of the resignations came from Republican officers. The resignations were received by Chief Behme and were submitted to the board. All resignations were accepted.

### I. *Appellee–Plaintiff Firemen*

On December 3, 1985, a class action suit was filed against the city. After extensive procedural maneuvering to get the class certified, an amended complaint was filed in December, 1986. The complaint alleged that the city reduced the rank of the demoted firemen because of political affiliation in violation of Ind.Code § 36–8–3–4 (the successor statute to I.C. § 18–1–11–3).[1] Specifically, the complaint alleged that the appellees were reduced in rank by the board without a hearing. The complaint further alleged that such action breached the contract between the appellees and the city, as well as violated the appellees' constitutional rights.[2] Additional parties were added to the suit; thus, the class action represented both the appellee-plaintiff and appellant-plaintiff firemen.

A bench trial began on February 1, 1994. On November 15, 1994, the trial court entered judgment in favor of the appellees and issued the following findings of fact and conclusions thereon:

"1. Plaintiff, Gregory S. Conley, was a Captain on the Fire Department and resigned that position on March 7, 1980. Chief Behme called Conley at the hose house on what is known as the small phone and told Conley that he wanted his badge and that if he refused there would be other ways to get it.

2. Plaintiff, Steven Kuehn, was a Captain on the Fire Department in 1980 and resigned that position on March 7, 1980.

In mid-February of 1980 Chief Behme called Kuehn at the hose house on the small phone and asked him if he had thought about giving up his badge.

3. Plaintiff, Glenn Linville, was a Captain on the Fire Department in 1980 and resigned that position on February 26, 1980. Chief Behme called Linville and relayed the message that if Linville did not give up his rank, Behme would make him wish that he had.

4. Plaintiff, William L. Wilson, was a Captain on the Fire Department and resigned that position on March 7, 1980. Chief Behme called him at home and told him that he should resign his position.

5. Plaintiff, Ron Tabor, was a Captain on the Fire Department and resigned his position on February 28, 1980. Chief Behme called Tabor three different times requesting Tabor's resignation and Behme told Tabor that if he declined they had ways of getting it.

6. Plaintiff, Ron Krepps, was a Captain on the Fire Department and resigned his position on March 8, 1980. Chief Behme called Krepps two different times and asked him to give up his captain's job. Behme told Krepps that if he did not give up his badge that Krepps would be moved to a less desirable hose house and that they would get his job one way or the other.

7. Plaintiff, Mike Martin, was a Captain on the Fire Department and resigned his position on March 6, 1980. Chief Behme called Martin twice and asked him to give up his job. Behme told Martin that if he refused, Martin would be sent to a different hose house and that they would get his rank one way or another.

8. Plaintiff, Phillip Garrison, was a Captain on the Fire Department and resigned that position on or about March 8,

---

1. Section 18–1–11–3 was in effect in 1979 when the resignations began. However, § 36–8–3–4 succeeded § 18–1 and is now in effect. The firemen alleged that the city violated both statutes. In finding for the firemen, the trial court did not indicate which particular statute was violated, instead, finding "there existed at all times relevant to this case statutes in the State of Indiana which prohibited these plaintiffs from

losing rank ... for political reasons...." Record, p. 359.

2. In addition, the complaint alleged that the city's actions were willful and intentional, and that these actions violated 42 U.S.C. § 1983. Ultimately, these two counts were dismissed from the amended complaint.

1980. Chief Behme called Garrison twice and told Garrison to resign his rank or be moved or reduced in rank by Behme.

9. Plaintiff, Randy Damm, was a Captain of the Fire Department in 1980 and resigned that position on February 22, 1980. He received a call from Chief Behme's office to report there in February, 1980. He went to Behme's office and was told by Behme to give up his badge, that trumped-up charges could be filed against him and that he (Damm) would give up his badge one way or the other.

10. That the plaintiffs above signed resignation forms prepared by Behme or someone on his behalf on stationery on which was included the City of Evansville and Mayor Michael Vandeveer's name.

\*    \*    \*    \*    \*    \*

17. The Fire Chief John Behme was aware of the status of the law which prohibited the reduction in rank of any fire fighter based upon political reasons.

18. The Fire Chief John Behme exerted and directed pressure upon the above plaintiffs and forced them to be reduced in rank solely for political reasons.

\*    \*    \*    \*    \*    \*

20. Mayor Michael Vandeveer was aware of the tensions, pressures, morale problems and political frustrations within the hose houses.

21. That Mayor Michael Vandeveer and the defendant, City of Evansville, Indiana, are charged with the responsibility for the unlawful actions of the Fire Chief in exerting political pressure on the above plaintiffs to force their resignation of rank."

Record, pp. 355–359. In finding for the appellees, the trial court concluded:

"3. Because the defendant basically told these plaintiffs to 'resign or else', they were not required to file grievances or pursue administrative remedies.

4. The actions of the defendant in telling these plaintiffs to 'resign or else' deprived these plaintiffs of the exercise of their own free will and amounted to legal duress.

5. The resignations from rank were not voluntary.

6. The defendant violated the statutes of the State of Indiana by reducing these plaintiffs in rank for political reasons."

Record, p. 359.

■ At the outset, we address our standard of review for findings of fact and conclusions thereon. Trial Rule 52 defines the standard and provides, "[o]n appeal of claims tried by the court without a jury ..., the court on appeal shall not set aside the findings or judgment unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." Ind.Trial Rule 52. In applying this rule, we employ a two-tiered standard of review. *W & W Equip. Co. v. Mink*, 568 N.E.2d 564, 569 (Ind.Ct.App.1991), *reh'g denied, trans. denied.*

■ First, we consider whether the evidence supports the findings. In determining whether findings are clearly erroneous, we construe the findings liberally in support of the judgment. *Citizens Progress Co. v. James O. Held & Co.*, 438 N.E.2d 1016, 1022 (Ind.Ct.App.1982). The findings are clearly erroneous only when a review of the record leaves us firmly convinced a mistake has been made. *Cooper v. Calandro*, 581 N.E.2d 443, 444–445 (Ind.Ct.App.1991), *reh'g denied, trans. denied.*

■ Next, we determine whether the findings support the judgment. A judgment is clearly erroneous when unsupported by the findings of fact and conclusions thereon. *DeHaan v. DeHaan*, 572 N.E.2d 1315, 1320 (Ind.Ct.App.1991), *reh'g denied, trans. denied.* In applying this standard, we neither reweigh the evidence nor judge the credibility of the witnesses. *Donavan v. Ivy Knoll Apts. Partnership*, 537 N.E.2d 47, 50 (Ind.Ct.App.1989). Rather, we consider the evidence that supports the judgment and the reasonable inferences to be drawn therefrom. *Id.* Finally, we must affirm the judgment of the trial court unless the evidence points incontrovertibly to an opposite conclusion. *Id.*

■ Turning to the merits of this case, we must determine whether the trial court erred

in finding that the city reduced the ranks of the firemen on the basis of political affiliation in violation of I.C. §§ 18–1–11–3 and 36–8–3–4. Section 18–1–11–3 provided that firemen "shall hold office or grade until they are removed by said board. They may be removed for any cause other than politics, ...." I.C. 18–1–11–3(a)(3) (Burns 1979). This prohibition is now codified in I.C. § 36–8–3–4, which prevents the board from considering the political affiliation of the firemen in determining whether dismissal or demotion is appropriate. I.C. § 36–8–3–4(b).

Essentially, to prevail on their claim, the appellees had to prove that the city reduced their rank for political reasons in violation of Indiana statutory law. To prove that the city reduced their rank for political reasons, the appellees argued that their agreement to accept lower rank (by signing the resignation form) was made under duress and as a result of the city's coercive actions. The city, however, argued that the agreements were not coerced or executed under duress and, therefore, that the reductions in rank were voluntary and not the result of its conduct. Thus, the city contested the trial court's conclusion that the appellees "lost" their rank and were "reduced" from rank. Instead, the city maintained that the appellees resigned their rank and, accordingly, were not "removed" from office as prohibited by statute. The trial court accepted appellee's argument, characterized the city's actions as "legal duress", and concluded that "[t]he defendant violated the statutes of the State of Indiana by reducing these plaintiffs in rank for political reasons". Record, p. 359.

In defining "duress", both parties cite to a supreme court decision which held that a noncompetition provision of an employment contract between a medical clinic and a physician was not a product of duress. *Raymundo v. Hammond Clinic Ass'n*, 449 N.E.2d 276 (Ind.1983). The city cites to one portion of the opinion which states "[t]he threat to breach a contract of employment, ... which might be aptly termed 'economic duress,' has been held not to conform 'to the Indiana definition of duress: an actual or threatened violence or restraint of a man's person, contrary to law, to compel him to enter into a contract.'" *Id.* at 282 (quoting *Williamson v. Bendix Corp.*, 289 F.2d 389, 392 (7th Cir.1961)). Based upon *Raymundo*, the city concludes that the resignations were not obtained by duress. In support of this contention, the city relies on the absence of evidence produced at trial to establish that the appellees were threatened with physical violence or were physically restrained.

However, while the city correctly notes the lack of evidence of physical violence or restraint, the city omits the latter portion of *Raymundo* which governs our review. The actual discussion of duress, in context, provides:

"The threat to breach a contract of employment, which appears to us to be analogous to the Clinic's alleged threat to withhold Dr. Raymundo's wages, which might be aptly termed 'economic duress,' has been held not to conform 'to the Indiana definition of duress: an actual or threatened violence or restraint of a man's person, contrary to law, to compel him to enter a contract.' '* * * [T]here is no doubt that the modern tendency of courts of law is to regard any transaction as voidable which the party seeking to avoid was not bound to enter into and which was coerced by fear of a wrongful act by the other party to the transaction. The earlier requirements of common-law duress may be regarded as merged into this broader definition.' However, although the law may now recognize instrumentalities of duress that were not previously viewed as such, the basic concept of the doctrine is the same; and *the ultimate fact to be determined is whether or not the purported victim was deprived of the free exercise of his own will.* Mere threats, which fall short of subverting the will, cannot constitute duress."

*Id.* at 283 (underline added) (citations omitted). Since the city relies only upon the first part of the *Raymundo* court's analysis, it has failed to address the application of the "ultimate fact to be determined" to the facts of this case. We find that the trial court properly focused on whether the appellees were deprived of the "free exercise of [their] will" rather than whether the ap-

pellees experienced threats of physical violence or restraint. *See id.* In support of this determination, we are mindful of the following definition of duress: "[a]ny unlawful threat or coercion used by a person to induce another to act (or to refrain from acting) in a manner he or she otherwise would not (or would)." Black's Law Dictionary 504 (6th ed. 1990).

Next, we find the trial court's conclusion that the appellees were deprived of the free exercise of their will was not contrary to law. The trial court did not err in determining the fire chief "exerted and directed pressure" on the firemen and "forced them to be reduced in rank". Record, p. 359. Each of the appellees testified about direct pressure applied by the chief, which led to the signing of the resignation forms.

First, Ron Tabor testified that he received a phone call from Chief Behme asking Tabor if he intended to turn in his captain's badge. Tabor stated he received an additional phone call asking whether he had given more thought to resigning. During the third phone call, Behme stated that there were other guys who wanted Tabor's badge and that if Tabor considered turning in his badge, Behme would guarantee that he could remain at his current fire house. When Tabor asked what would happen if he refused to give up his rank, Behme stated, "[w]ell we have ways of getting it." Record, p. 388. Tabor believed that Behme's statement could be interpreted to mean that ranking officials would file a false charge against him or repeatedly move him to different stations in an effort to induce Tabor's cooperation. Tabor testified that he considered Behme's statements to be a threat and that he resigned his captain's position in an effort to avoid "anything bad" on his record. Record, p. 388. Further, Tabor testified he did not voluntarily give up his rank.

Second, Ron Krepps testified that he received a number of notes in his locker. One note said "Captain Ron K., (Private). We will get your Captain's job shortly.—" Record, pp. 469, 1091. The note had a bull's eye with an arrow through it and was signed "Good Democrat, Crow Crow Crow, Ha, Ha, Ha." *Id.* Krepps testified that Behme called him and stated that Krepps had better resign or take the risk of being moved to a less desirable fire house. Moreover, Behme stated he would get Krepps' resignation one way or the other, even if Behme had to bring a false drinking charge against Krepps. Krepps also indicated that Behme's threat of filing a false charge played a role in signing the resignation and that he did not sign it voluntarily.

Third, Michael Martin testified that he received several phone calls from Chief Behme. Each time, Behme asked if Martin had considered giving up his rank. Behme stated that if Martin did not give up his rank, he would be moved to fire house 7, which was commonly known as a "dead house". Record, p. 502. Furthermore, Behme stated that if Martin did not resign, Behme would get the rank "one way or the other." Record, p. 501. Martin testified that he understood Behme's statement to mean that Behme would find a reason, legitimate or not, to get the resignation. A prepared resignation was delivered to Martin at his fire house. After Martin objected to the form and refused to sign it, Behme told Martin that either he signed the form or he would be moved to fire house number 7. Martin testified that he signed the form because of a threat of something happening to him if he did not.

Fourth, William Wilson testified he received a phone call from Behme at his home. Behme asked if Wilson was ready to resign his position. Wilson testified that he resented the phone call at home. Wilson resigned the next day because he resented the phone call at home and because Behme wanted his job; "[when] you get a call at home, I would say you go pay attention to it." Record, p. 567.

Fifth, Phillip Garrison indicated he received a number of letters and phone messages that stated he must resign or he would be "set up". Behme called Garrison at home while Garrison was on vacation. Garrison testified that Behme said, "When you go back to work, I am going to reduce [move] your ass. You either resign or I am going to reduce your ass." Record, p. 648. Behme also told Garrison that a ranking officer

would come to Garrison's fire house the following day to deliver a resignation for Garrison to sign; Behme stated that if Garrison did not sign, then he would be moved. The official was at the fire house as planned and Garrison signed the form. Garrison testified he did not voluntarily resign.

Sixth, Glenn Linville testified that Behme called him at the fire station and told him that if he resigned his rank then he could continue to work at the same fire house. When Linville asked what would happen if he did not resign, Behme responded, "[w]e'll make you wish you had." Record, p. 695. When Linville asked precisely what the statement meant, Behme responded that he would "[m]ove you every day or whatever it takes to get your badge." Record, p. 695. Linville characterized any challenge to the mayor or the board like carrying a knife into a gun fight in which "you don't have much of a chance." Record, p. 696. Linville stated he did not voluntarily give up his rank.

Seventh, Steven Kuehn similarly testified that Behme called him at the fire house and asked if he intended to resign his rank. Sometime later, Kuehn approached a ranking officer and asked what could be done to him if he did not give up his captain's position. The officer responded that various things could be done, including being moved every hour if Behme so desired. This action would reduce Kuehn to a "floating" captain who moved from fire house to fire house. Kuehn testified that he understood that they were going to "get him" one way or the other.

Eighth, Gregory Steven Conley received a phone call from Behme during which Behme stated he wanted Conley's badge. According to Conley, Behme denied that the resignation was sought because of Conley's job performance. Conley asked Behme three times if he could come down to Behme's office to discuss the situation, but Behme refused. Instead, Behme demanded to know whether Conley was going to give up his badge. When Conley asked what would happen if he

refused to resign, Behme stated "Well there's [sic] other ways to get it." Record, p. 775. Conley testified that he took Behme's statement to mean he would "have to be looking over [his] shoulder" every time he was at the fire house. Record, p. 775. In addition, Conley testified that he did not voluntarily sign the resignation, but did so under duress.

Finally, Randy Damm testified he received a phone call from Behme telling Damm to report to Behme's office the following morning. At the meeting, Behme stated "it's time that you give up your badge." Record, p. 802. When Damm stated that he had hoped to keep the position because of his qualifications, Behme responded that qualifications had nothing to do with the department's system. Behme threatened to institute false charges against Damm and stated that "one way or another" Damm would give up his badge. Record, p. 803. Damm testified that he did not voluntarily resign, but did so as a result of duress and coercion.

Moreover, Behme testified that the department's ranking system was not based on merit but on politics.

Applying the law to the present facts, we find that the evidence supports the trial court's findings; we are not persuaded or convinced by the city's argument that a mistake has been made. *See Cooper,* 581 N.E.2d at 444–445. The appellees testified to direct pressure by Behme. In addition, the findings support the trial court's judgment that the appellees were deprived of their own free will. The findings indicate that the appellees were subjected to pressure by Behme which forced each of them to resign. The resignations were prepared on stationary which included the names of the city and the mayor.

Finally, the city argued that even assuming Behme did threaten the appellees, these threats were only "mere threats" and did not rise to the level of duress.[3] *See Raymundo,*

---

**3.** The city made two other arguments. First, it argued that even if the appellees were subject to threats or coercion, they could have sought immediate action under 42 U.S.C. § 1983 or immediate injunctive relief by the board. However, whether the appellees might have received favorable treatment by the board is speculative and merely goes to the weight of the evidence. On appeal, we may not reweigh the evidence. *See Donavan,* 537 N.E.2d at 50.

449 N.E.2d at 283. Therefore, the city argues that the trial court's findings do not support the judgment. However, we disagree. Implicit in the court's judgment that the appellees were deprived of their free will is that more than "mere threats" were made. The findings are sufficient to support this conclusion. Most appellees were told either to resign or risk transfer. Some appellees were told that the rank reduction would be done one way or the other. Other appellees were told "we'll get you one way or the other." In addition, the resignations were prepared by someone other than the appellees. Some resignations were personally delivered to the appellees while, in other cases, a ranking official threatened some immediate undesirable consequence if the resignation was not signed. These actions forced the appellees to sign the resignation form; there was no reasonable choice. Consequently, the trial court concluded that these actions subverted the free will of the appellees. We find no error. Since the evidence does not point incontrovertibly to a conclusion opposite that made by the trial court, we must affirm the judgment. *See Donavan*, 537 N.E.2d at 50. Therefore, we hold that the trial court did not err by concluding that the city reduced the rank of the appellees for political reasons in violation of Indiana law.

## II. *Appellant–Plaintiff Firemen*

This appeal has essentially the same procedural history as the prior case. The only distinction is that on October 26, 1994, the trial court entered judgment in favor of the city as to these plaintiffs and issued special findings of fact and conclusions thereon which state:

"1. Plaintiff, John Craddock, was a Captain on the Fire Department in 1980 and resigned that position on February 27, 1980. Craddock testified that he contacted Chief Behme about his job on at least two occasions. He further testified that he received no threats of any kind from Chief Behme about his job.

2. Plaintiff, Del Cato, was a Captain on the Fire Department in 1980 and resigned that position on March 11, 1980. The plaintiff contacted Chief Behme about his job.

3. Plaintiff, William D. Dickinson, Sr., was a Captain on the Fire Department and resigned his position on March 8, 1980. He testified in a deposition in 1989 that he was not contacted by Chief Behme about his position.

4. Plaintiff, Marvin C. Buente II, was a Captain on the Fire Department in 1980 and resigned that position on March 9, 1980. He was not contacted by Chief Behme about his position.

5. Plaintiff, Art Steiner, was a District Chief on the Fire Department in 1980 and he resigned his position on March 5, 1980. He was not contacted by Chief Behme about his position.

6. Plaintiff, Leander Williams, was a District Fire Chief on the Fire Department in 1980 and resigned that position on March 6, 1980. He was not contacted by Chief Behme about his position and he testified that he signed his resignation form voluntarily.

7. All of the above plaintiffs were aware of the rumors within the Fire Department about their potential loss of rank. However, none of them were ever threatened with loss of rank by anyone this Court can directly link to the defendant, City of Evansville.

8. None of the above plaintiffs chose to file any grievance, attend the next Safety Board meeting or make any attempt to withdraw their resignation.

9. All of the above plaintiffs voluntarily resigned their positions."

Second the city argues that the appellees ratified their resignations by waiting almost five years before filing a complaint. The city argues that by waiting so long without complaint, the appellees confirmed their resignations and cannot now attempt to avoid them by claiming duress. The city cites *Lawlis v. Kightlinger and Gray*, 562 N.E.2d 435 (Ind.Ct.App.1990), *reh'g denied, trans. denied,* for support. However, we find *Lawlis* inapplicable here since, unlike *Lawlis*, the appellees did not act "in a manner which shows an intent to confirm the contract." *Id.* at 443. Rather, the appellees accept their resignations for reduction in rank. However, the appellees argue that the reduction in rank caused them harm and, therefore, that they are entitled to damages.

Record, p. 353. In its conclusions thereon, the trial court stated that the city did not violate any law when it accepted the voluntary resignations from these appellants. Furthermore, the court stated that "[t]he above plaintiffs were not coerced nor acting under legal duress when they signed the resignation forms." Record, p. 354. The firemen appeal this judgment.

The appellants argue that the evidence does not support the findings. Specifically, they claim that actions by the Democratic administration or its appointees and the Democratic members of the department caused a reduction in rank for political purposes. The appellants maintain that they faced either direct or indirect coercion and duress. "Although these are seemingly humorous banterings between members of the Fire Department, it is a form of subtle coercion and duress obvious to all Republican Department members." Appellant's brief, p. 17.

Briefly restated, our standard of review involves the application of a two-tier test. First we determine whether the evidence at trial supports the findings. *Citizens Progress Co.*, 438 N.E.2d at 1022. In making this determination, we view the findings in the light most favorable to support the judgment. *Id.* Second, we determine whether the findings support the judgment. *DeHaan*, 572 N.E.2d at 1320. In applying this standard, we neither reweigh the evidence nor judge the credibility of the witnesses. *Donavan*, 537 N.E.2d at 50. After reviewing the case, we find that the trial court did not err.

■ First, John Lawrence Craddock testified that he called Behme to express his desire to retain the captain's ranking. At that time, Behme indicated that he saw no reason why Craddock could not keep the rank. In subsequent phone calls made by Craddock to Behme, Behme stated that he was receiving a lot of pressure about Craddock not resigning. Behme indicated it would be in Craddock's best interest to resign. Craddock testified that he did not resign voluntarily.

The evidence supports the finding about Craddock. The appellants argue that the evidence at trial established a direct political coercion by the chief. Moreover, they contend that the evidence is "uncontroverted and overwhelmingly denies the accuracy" of the trial court's finding. *See* appellant's brief, p. 15. However, this argument is merely a request to reweigh the evidence. We may not do so. *See Donavan*, 537 N.E.2d at 50. The trial court found that Craddock was not threatened. Upon our review, we are not firmly convinced that a mistake has been made and, accordingly, the finding is not clearly erroneous. *See Cooper*, 581 N.E.2d at 444–445.

■ Second, Del Cato testified that he approached Behme and asked what would happen if he did not resign. Behme said, "I am going to get you sooner or later, one way or another, but I am going to get you." Record, p. 544. Cato testified that he thought about Behme's statement for a few days and then signed the resignation form. He indicated that he did not do so freely.

The appellants did not offer an argument to explain how the trial court's findings were clearly erroneous with respect to Cato. Failure to provide a cogent argument on appeal effectively waives the issue. *See* Ind.Appellate Rule 8.3(A)(7). Therefore, we will not address the merits and we find that the trial court did not err.

■ Third, Dickinson testified that he received a phone call from Behme asking if he was going to turn in his badge. This phone call occurred several months before Dickinson resigned. On the day of his resignation, Dickinson received three phone calls from the District Chief, William Mosby. Mosby asked Dickinson if he was ready to turn in his badge. When Dickinson stated he did not want to turn in his badge, Mosby stated, "Well you are going to have to turn you badge in or move to, [sic] probably to a different shift." Record, p. 593. After several phone calls, Mosby indicated to Dickinson that if he resigned his rank, Dickinson could remain in his current fire house.

The trial court found that during a 1989 deposition, Dickinson testified he was not contacted by Behme. The appellants argue that Dickinson's testimony established that

Behme contacted Dickinson a few months before he resigned.[4] While Dickinson did testify that he was contacted by Behme, he admitted on cross-examination that in the deposition he denied any contact with Behme. The trial court weighed the evidence in favor of accepting Dickinson's deposition and found that he was not contacted by Behme. We may not reweigh the evidence on appeal. Rather, we may only examine the order for a clearly erroneous finding. We conclude that the finding as to Dickinson was not clearly erroneous.

■ Fourth, Marvin Buente II testified he did not receive any phone calls and did not talk to any ranking official with the department before he signed the resignation letter. Thus, the evidence clearly supports the trial court's finding about Buente. In the appellants' statement of facts, they argue that Buente was pressured to resign by the district chief.[5] However, implicit in the trial court's order is the finding that Chief Behme acted as the sole agent for the city. The trial court did not consider actions by other officials. The appellants have neither provided citation to authority nor developed an argument to convince us that the trial court erred in concluding that appellants were not subjected to duress despite contact from other ranking officials. Therefore, the trial court did not err when it found that Buente was not under duress when he signed the resignation.

Fifth, Art Steiner testified that "[t]here was no physical threat made to you or anything, but it was just alot [sic] of little subtle things that were said to you." Record, p. 573. Steiner indicated that Behme never called him or spoke to him about the cap-

tain's rank. This evidence clearly supports the trial court's finding. The appellants argue that the fact that Steiner believed he could not hold his position once Williams resigned and the fact that Steiner had been shunned by others in the department demonstrate that Steiner involuntarily resigned. However, we may not reweigh the evidence. The trial court found that Steiner voluntarily resigned. Since the evidence does not incontrovertibly point to the opposite conclusion, we must affirm. *See Donavan,* 537 N.E.2d at 50.

Finally, Leander Williams testified that Chief Gronotte approached Williams' friend and asked whether the friend was going to turn in his badge. Williams stated that nothing was said to him by Gronotte. Williams indicated that he was ignored at the fire house. He also testified that he signed the resignation voluntarily. The evidence clearly supports the findings. Appellants argue that Williams involuntarily resigned because he was shunned by other department personnel and, thus, could not perform his job adequately. This argument is a request to reweigh the evidence which, as often mentioned, may not be done.

Therefore, we find that the evidence supports the findings and, thus, the trial court did not err. Turning to the second part of our test, we find that the findings support the judgment.[6] The findings by the trial court demonstrate that four of the appellants were not contacted by Behme. The other two appellants contacted Behme for advice and, one of these appellants indicated that he was not threatened by Behme. Thus, the findings are sufficient to support the judgment. Accordingly, the trial court did not err.

4. This argument actually appears in the "statement of facts" section of the brief rather than the "argument" section as required by Ind.Appellate Rule 8.3.

5. Again, we note that the appellants failed to include an argument regarding Buente's resignation in the "argument" portion of their brief in violation of App.R. 8.3(7).

6. Given the unorganized format of the appellants' brief, it is difficult for us to discern all of

their arguments. Thus, it is hard to tell where a challenge to the findings of fact ends and whether there is even a challenge to the conclusions of law. Despite the appellants' broad introductory statements, we are not confident that a cogent argument challenging the conclusions is within the appellants' brief. Notwithstanding this difficulty, we summarily address the conclusions of law and hold that the trial court did not err.

For the foregoing reasons, the judgment of the trial court is affirmed in all respects.

AFFIRMED.

BARTEAU and RUCKER, JJ., concur.